AMERICA CONDOMINIUM
ASSOCIATION, INC., et
al.

v.

IDC, INC., et al.

No. 2001–469–Appeal.

Supreme Court of Rhode Island.

March 23, 2004.

Michael B. DeFanti, Esq., Providence, for Plaintiff.

Daniel Goldberg, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLAHERTY, Justice.

In these cross-appeals from partial summary judgment, we are called upon to interpret portions of G.L.1956 chapter 36.1 of title 34, entitled the Rhode Island Condominium Act. At issue is the status of certain condominium property on Goat Island in Newport, Rhode Island.

## I

### Facts/Procedural History

The plaintiffs, America Condominium Association, Inc., Capella South Condominium Association, Inc., and Harbor Houses Condominium Association, Inc. (collectively, the plaintiffs), filed a seven-count complaint against the defendants, Island Development Corporation, Inc. (IDC, Inc.), IDC Properties, Inc. (IDC Properties), and their president, Thomas R. Roos (Roos) (collectively, the defendants), seeking both compensatory and exemplary damages as well as declaratory and equitable relief.[1] They maintained that the defendants had improperly extended their development rights on certain areas of common property within the condominium complex and that because these development rights actually had expired, title to the common property now vested in the plaintiffs in fee simple. The parties filed cross-motions for partial summary judgment. After a hearing on the motions, the hearing justice ruled in favor of the plaintiffs, precipitating the defendants' appeal.

Although plaintiffs prevailed on their partial summary judgment motion, they contend in their appeal that the subsequently entered judgment did not accurately reflect the hearing justice's bench decision. In addition to appealing the grant of plaintiffs' motion for partial summary judgment, defendants dispute plaintiffs' appellate contentions.

---

1. After joining plaintiffs' motion for partial summary judgment, Harbor Houses Condominium Association, Inc., moved to voluntarily dismiss itself from the case. The Superior Court granted the motion and dismissed its claims for compensatory and exemplary damages without prejudice; however, its declaratory and equitable claims for relief were dismissed with prejudice. Pursuant to Rule 19 of the Superior Court Rules of Civil Procedure, Harbor Houses was then realigned as an involuntary plaintiff with respect to its declaratory and equitable claims.

This story begins on January 13, 1988, when Globe Manufacturing Co. (Globe), predecessor in interest of defendants, recorded a declaration of condominium designated as "Goat Island South—A Waterfront Condominium" (GIS Condominium) in the Land Evidence Records of the City of Newport.[2] The condominium area was situated on Goat Island and consisted of approximately twenty-three acres. Included within the legal description of the condominium area were six defined parcels. Three of the parcels contained existing residential buildings. They were: America Condominium (America), which contained a forty-six-unit apartment building, Capella South Condominium (Capella South), which contained an eighty-nine-unit apartment building, and Harbor Houses Condominium (Harbor Houses), which contained nineteen stand-alone waterfront homes. The other three parcels were undeveloped and consisted of: the "Individual Unit" (later designated as the West Development Unit), "Development Unit # 1" (later designated as the South Development Unit), and "Development Unit # 2" (later designated as the Reserved Area or the North Development Unit).[3]

On March 3, 1988, Globe and Goat Island South Condominium Association, Inc. (the master association) amended and restated the original declaration and entitled it the first amended and restated declaration of condominium.[4] It was designated as the master declaration. In the master declaration, a distinction was made between master units, so-called, and sub-condominiums, so-called, and between their respective status and rights within the GIS Condominium. A master unit was defined as "a physical portion of the Goat Island South Condominium designated for separate ownership or occupancy or designated as a Sub–Condominium * * *." A sub-condominium was defined as "any Master Unit of the Goat Island South Condominium that is itself a condominium." Each sub-condominium had its own specific, individual, declaration of condominium.

"Master Common Elements" included utilities, recreational facilities, all storage areas, grounds, gardens, plantings, walkways, parking areas, and "all other property normally in common use by the Owners and Unit Owners, all areas of the Project that do not fall within a Master Unit itself and are not labeled as part of the Master Unit, and all areas and facilities designated as 'common elements' in the [Condominium] Act." Common elements were defined in the master declaration as "Common Elements of a Sub–Condominium as defined in the Declaration of such Condominium."[5]

Section 3.2 of the master declaration provided that "[t]he land underlying each Master Unit is a Master Limited Common Element allocated to the exclusive use of such Master Unit subject to the easements and rights set forth herein." A master limited common element was defined as:

2. At the time, defendant Roos was Globe's director.

3. For the sake of simplicity, the Individual Unit and Development Unit # 1 will be referred to as the West Development Unit and the South Development Unit, respectively.

4. The master declaration, or First Amendment to the original declaration, has not been challenged.

5. The Capella South declaration of condominium states that common elements include "without limitation, all elements of the Building and Property not included in any Unit" and lists examples such as improvements on the land, foundations, lobbies, hallways, utility services and "[a]ll other property normally in common use by the Unit Owners[.]"

"that portion of the Master Common Elements appurtenant to or associated with or reserved for use by one or more but fewer than all Master Units, and intended for the exclusive use of such Master Units and which are identified as Master Limited Common Elements herein and/or in the Plats and Plans."

Thus, in essence, a master unit consisted of the airspace above a master limited common element, while the master limited common element itself consisted of the physical land beneath the master unit airspace.

The master declaration also defines two types of owners. An "Owner" is defined as "the Declarant or other person or persons owning a Master Unit, which Master Unit is not a Sub–Condominium * * *." A "Unit Owner" is defined as "the Declarant or other person or persons owning a Unit of a Sub–Condominium * * *[,]" where a unit is defined as "a physical portion of a Sub–Condominium designated for separate ownership or occupancy."

The master declaration says that the declarant reserved certain development rights in the original declaration,[6] including the right to convert the land underlying America, Capella South, Harbor Houses and the West and South Development Units into master limited common elements with development rights in the above master unit airspace. It also reserved the right to convert Development Unit # 2, or the Reserved Area, into a master common element with reserved development rights to either further convert the area into a limited master common element, with an associated master unit owning the above airspace and development rights, or to completely withdraw the area from the GIS Condominium. On

March 3, 1988, the declarant exercised its rights as allowed in the original declaration. Thus, the declarant converted the land underlying America, Capella South, Harbor Houses, the West and South Development Units into limited master common elements, and converted the Reserved Area into a master common element with reserved development rights in the master declaration.

Accordingly, the airspace above the limited master common elements became master units consisting:

"of the airspace above and all buildings and improvements now or hereafter located on the land * * *, but excluding said land itself. The lower boundary of such Master Unit is the upper surface of the land under the Master Unit. * * * There is no upper boundary."

Pursuant to the special declarant and development rights section of the master declaration, the declarant reserved certain rights to construct improvements until December 31, 1994.

Furthermore, under the master declaration, each master unit possessed a delineated, fixed percentage of the undivided ownership interest in the master common elements. Such master common elements would be controlled and maintained by a master association, which itself would be controlled by a master executive board consisting of representatives from each master unit. Thus, those representatives would act on behalf of, and make decisions for, the individual sub-condominium unit owners, or residents, at the master executive board meetings. Each sub-condominium also would have its own sub-association controlled by its individual sub-association executive board. These sub-associations

---

6. A copy of the original declaration was not available in the file; consequently, we have had to rely upon the representations made in the master declaration concerning that document.

would control and maintain the individual common areas exclusive to each sub-condominium. At the time of the master declaration, only America and Harbor Houses were considered to be sub-condominiums.[7] The undeveloped West and South Development Units were wholly owned and controlled by the declarant.

The master declaration further provided that the percentage voting rights and financial obligations of each master unit was based upon its undivided, "master allocated interest" in the master common elements of the condominium scheme.[8] The specific master allocated interest of each master unit was delineated in an attached exhibit to the master declaration as follows: (1) Harbor Houses—21.42 percent; (2) America 19.25—percent; (3) Capella South—39.61 percent; (4) South Development Unit—9.6 percent; and, (5) West Development Unit—10.12 percent. The aforementioned percentages represented the relative voting rights that each master unit was entitled to cast at a master association meeting. The exhibit also described the individual percentage master allocated interests of the individual units within America and Harbor houses. Significantly, however, votes at the master association meetings could be cast only by members of the master executive board.

After passage of the 1988 master declaration, Globe's interests were transferred to IDC, Inc., and thereafter to IDC Properties, through a series of sales and assignments.[9] As successor declarant, IDC, Inc., and later IDC Properties, possessed all of the development rights in the undeveloped West Development and the South Development master units, as well as in the Reserved Area. By early 1994, the declarant had not yet exercised the development rights set forth in the master declaration. Realizing that the December 31, 1994 deadline to develop was fast approaching, it attempted to extend the deadline through a series of amendments to the master declaration. These amendments were discussed and purportedly passed at special meetings of the master association conducted by the master executive board between April and December 1994. At the time, the declarant, had a controlling interest in the master executive board.[10]

In a notice dated April 15, 1994, Roos, in his capacity as president of the master association, announced that a meeting of the master association would be conducted

7. The declarant later converted the Capella South master unit into a sub-condominium on May 12, 1988, pursuant to its special declarant and development rights under the master declaration.

8. Specifically, a "master allocated interest":

"shall mean: (i) With respect to a Master Unit that is not a Sub–Condominium, the undivided interest in the Master Common Elements allocated to such Master Unit, which shall equal the percentage liability for the Master Common Expenses, and which shall equal the percentage vote in the Master Association associated with such Master Unit as set forth in Exhibit Y; (ii) with respect to a Sub–Association, the percentage liability for the Master Common Expenses, which shall equal the percentage

vote in the Master Association associated with such Sub–Association as set forth in Exhibit Y; and (iii) with respect to a Unit Owner in a Sub–Condominium, the percentage of undivided interest in the Master Common Elements allocated to such Unit Owner's Unit as set forth in Exhibit Y."

9. IDC, Inc., transferred its interests to IDC Properties on October 19, 1994.

10. As previously mentioned, the executive board of the master association is composed of master unit owners and sub-association representatives. IDC, Inc. controlled the majority of the board's votes by virtue of its outright ownership of the West and South Development Units and as the owner of the majority of the individual residential units in America, Capella South and Harbor Houses.

on April 27, 1994, for the purpose of extending:

"the period for the exercise by the declarant of the Development Rights contained in [the master declaration] until December 31, 1999 plus any additional period as may be approved by the Federal National Mortgage Association, such additional period to terminate by December 31, 2004."

It is important to note that no notice of the meeting was given to the individual unit owners.

The actual specifics of the proposed change were not revealed until the special meeting. Styled as the Third Amendment to the master declaration, the change would extend special declarant rights to December 31, 1999. Until that date, the declarant would have the right to: (a) withdraw the Reserved Area from the GIS Condominium, provided that it has not already been converted into a master unit; (b) convert the Reserved Area into a Master Unit; (c) construct any legally permissible residential and non-residential improvements on the property, including a Sub–Condominium not exceeding 315 units on the property; (d) convert the land in the master units into master limited common elements that then could be excavated or otherwise altered "to the extent necessary or desirable to develop and/or operate and maintain such Master Unit[s] * * *."

The minutes from the special meeting noted that the sub-association representatives expressed reservations about the proposed amendment, stating that their consent "should be conditioned on their review and approval of any proposed development of those areas." Roos indicated that no such proposals existed and that "the exact purpose of the Amendment [was] to provide the Declarant with additional time to develop a proposal for the Reserved Area." After it was observed that "at least 67% in voting interest of all Owners and Sub–Association Board Members" was required in order to amend the master declaration, a vote was taken. The Third Amendment "was approved with 85.29% in allocated interest voting in the affirmative, 4.81% in allocated interest present but withholding its vote * * *, and 9.90% in allocated interest absent and not voting."

Thereafter, in a notice dated November 1, 1994, Roos informed the executive board that a special meeting would be conducted to extend certain development rights until December 31, 1999. Attached to the notice was an exhibit showing that the proposed amendment affected only the South Development Unit and also provided the granting of an easement over the common elements of America so that an access road to the South Development Unit could be built. This would be the Fourth Amendment to the master declaration.

On November 15, 1994, the special meeting was convened. Several individual unit owners attended the meeting, and at least one of them objected to the proposed amendment. However, the individual unit owners were not permitted to vote because that privilege was reserved only for the master executive board members. The Fourth Amendment "was approved with 76.55 percentage in allocated interest voting in the affirmative and 23.45 percent in allocated interest absent and not voting."

In a subsequent notice, dated December 16, 1994, Roos informed the master executive board of yet another special meeting, to be held December 28, 1994. The stated purpose of that meeting was:

"1) To approve the extension of the period for the exercise by the Declarant of the Development Rights with respect to [the South Development Unit] and the Reserved Area;

"2) To permit the conversion of the land, excluding the air above, that comprises the Reserved Area into a Master Limited Common Element;

"3) To confirm that the Owner, Sub–Association and Unit Owners with respect to any Master Unit shall have the rights, as the case may be, to create a sub-condominium out of such Master Unit, to execute, amend, terminate and record a declaration with respect to such sub-condominium, and to construct improvements within such Master Unit and the Master Limited Common Elements associated therewith;

"4) To provide for the right of the Declarant to withdraw the Reserved Area Master Unit (when created), including the Master Limited Common Element thereunder from the Goat Island South Condominium;

"5) To provide that Master Common Expenses benefiting fewer than all the Master Units shall be allocated among the Master Units that are benefited by such expenses * * *;

"6) To reallocate the Master Allocated Interests between the [West Development] Unit and the [South Development Unit]. This will not affect the Master Allocated Interest of any other Master Unit;

"7) To permit the Owners of [the South Development Unit] and the [West Development] Unit to reallocate the number of units between the [South Development Unit] and the [West Development] Unit. This will not increase the aggregate number of units permitted to be constructed within these two units * * *.

" * * *

"10) To make other amendments to clarify, restate or define Declarant's Development Rights * * *." [11]

In addition to the above announcement, a notice dated December 20, 1994, was sent to the individual unit owners inviting them to attend the special meeting. However, the notice specifically informed the residents that although they were welcome to attend, "voting on the amendments is limited to the members of the various condominium boards * * *." Thereafter, notice was given of a special executive board meeting to follow the special meeting on December 28, 1994. The purpose of that additional meeting was "to recalculate the monthly installments for Master Common Expenses against each Master Unit in accordance with the Amendments [being] contemplated * * *."

On December 28, 1994, both of the above-noticed meetings were conducted. The minutes of the first special meeting indicate that the individual unit owners of America, Capella South and Harbor Houses again were informed that they would not be permitted to vote because they were represented at the meeting by "the Unit Owners Executive Board Members elected by them at the Sub–Association level by the Sub–Association Board Members." The minutes further reflect that Dr. Philip Schub, one of the executive board members for Harbor Houses, stated at the meeting that any "vote was academic because the percentage as explained by the Chair was in favor of the declarant." Another executive board member, who represented America, Dr. Frank D'Allesandro, objected to either amending the declaration or extending the development rights, believing that it did not conform with Rhode Island condominium law.

---

11. At the meeting, the declarant's development rights were extended until December 15, 2015. The extension was reflected in the Fifth Amendment.

Thereafter, he abstained from what he deemed to be an illegal proceeding.

During the meeting, a Sixth Amendment to the master declaration also was discussed. That amendment would convert the Reserved Area into a master limited common element whose above airspace would constitute a master unit with associated development rights.[12] The converted area would be known as the North Development Unit. Thereafter, a vote was taken on the proposed amendments and "[a] calculation of the votes resulted in the necessary percentage to approve the Amendments of the Declaration and Bylaws."

The parties continued to disagree over the disputed amendments to the master declaration and how those amendments were effectuated. The record reflects that on January 5, 1998, a tolling agreement was executed. The accord provided that, for purposes of the agreement, any legal action filed by the parties on or before June 30, 1998, concerning the creation of, amendments to, and operation of the condominium property would be deemed to "have been commenced, filed and served, for purposes of statute of limitations, laches, waiver, estoppel or similar defenses, on December 1, 1997." This tolling agreement was extended three times thereafter. The final document indicated that any action filed on or before May 31, 1999, would

be deemed to have been filed on December 1, 1997. Significantly, in 1998, well after the execution of the tolling agreement, IDC constructed a function center known as the Newport Regatta Club on the North Development Unit/Reserved Area.

On May 29, 1999, plaintiffs filed a seven-count legal and equitable action.[13] Their complaint alleged that the voting procedure employed to extend the development rights did not conform with the Rhode Island Condominium Act; consequently, they averred, the amendments extending those rights were invalid. They further contended that when defendants failed to exercise their development rights on or before December 31, 1994, their reserved interest in the undeveloped units ceased to exist, thus implying that fee simple title then vested in plaintiffs.

On January 18, 2000, plaintiffs filed a motion for partial summary judgment on counts 1, 2, 3, 4 and 7 of the complaint. The defendants filed a counter-motion for partial summary judgment seeking the Superior Court to declare: (a) that IDC Properties, as owner of the North West and South Development Units, has the right to construct buildings and improvements on those areas at any time; (b) that IDC Properties, as successor declarant, may exercise its right to develop either or

---

12. The plaintiffs do not challenge the validity of the Sixth Amendment to the master declaration, conceding that the master declaration granted the declarant the right to make such a conversion on or before December 31, 1994.

13. In counts 1 and 2, plaintiffs petitioned the Superior Court to declare that the voting procedures were statutorily invalid and that the amendments were void *ab initio*, respectively. Count 3 asked the court to declare that the declarant no longer had any ownership interest or voting rights in the disputed master units because said rights had expired on December 31, 1994, and to estop declarant from exercising development rights in those units.

Alternatively, they sought compensatory damages in count 3. In count 4, plaintiffs challenged the allocation of the master common expenses as prescribed by the Fifth Amendment and sought injunctive and compensatory relief. Count 5 involved a compensatory claim for breach of fiduciary duty and count 6 sought injunctive relief from an alleged interference with an easement. Finally, in count 7, plaintiffs sought punitive damages and attorney's fees against declarant under counts 1, 2, 3 and 4, and against Roos under count 5 of the complaint, for their willful failure to comply with the Condominium Act, the master declaration and the master bylaws.

both of the North and West Development Units into condominiums, to convert the West Development Unit into a master common element, and to withdraw the North development Unit from the GIS Condominium until December 31, 2015; and (c) "that plaintiffs' challenges to the aforementioned rights of IDC are without merit and are further barred by the applicable statute of limitations and by the doctrine of laches."

After reviewing the parties' cross-motions for partial summary judgment, the hearing justice granted plaintiffs' motion and denied defendants' motion. She determined that G.L.1956 § 34–36.1–2.17, governing the voting procedures required to implement amendments involving the creation or increase of special declarant rights, was applicable to the amendments in dispute. She found that the master declaration violated this provision because it permitted the disputed amendments to be implemented with a mere 67 percent vote, rather than by the unanimous consent of the unit owners, as specifically required by the statute. She then determined that because the amendments did not conform with the legislation, the one-year statute of limitations was inapplicable. Instead, the hearing justice found that the suit was timely within the ten-year period of limitations for civil suits enunciated in G.L.1956 § 9–1–13. The hearing justice also found that the tolling agreement, which was voluntarily entered into by the parties, precluded defendants' affirmative defense of laches.

In concluding her decision, the hearing justice declared that:

"(1) the Defendant's [sic ] right to develop Goat Island has expired.

"(2) the alleged voting rights are null and void, and

"(3) the Master Association is without legal authority to act on behalf of the unit owners."

Subsequently, each side submitted proposed partial judgments. The court accepted the partial judgment submitted by defendants and entered it pursuant to Rules 54(b) and 57 of the Superior Court Rules of Civil Procedure. The partial judgment declared that "defendants' purported extensions of its development rights are annulled" and that because the Third, Fourth and Fifth Amendments were improperly adopted, they were "void *ab initio* and have been recorded *ultra vires*." The partial judgment also provided that:

"a) Defendants' developments rights on Goat Island have expired.

"b) Defendants' alleged voting rights as exercised are null and void.

"c) The Master Association is without legal authority to act on behalf of the unit owners, as it did in adopting the Third, Fourth and Fifth Amendments."

On appeal, plaintiffs contend that the partial judgment, as entered, did not accurately reflect the decision of the court because it did not state that fee simple title was now vested in plaintiffs. Although defendants dispute the inaccuracy of the judgment, they also maintain that the hearing justice erred in granting plaintiffs' motion for partial summary judgment.

## II

### Standard of Review

■■■ "In passing on a grant of summary judgment by a justice of the Superior Court, this [C]ourt conducts a *de novo* review." *United Lending Corp. v. City of Providence*, 827 A.2d 626, 631 (R.I.2003). This court will uphold a trial justices' grant of summary judgment "[o]nly when a review of the admissible evidence viewed

in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Carlson v. Town of Smithfield,* 723 A.2d 1129, 1131 (R.I.1999) (per curiam)). "[A] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." *Id.* (quoting *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1225 (R.I.1996)). Consequently, we shall proceed to conduct our *de novo* review of the record to determine whether plaintiffs were entitled to judgment as a matter of law.

### III

### The Condominium Act

In 1982, the Legislature adopted chapter 36.1 of title 34, entitled the Rhode Island Condominium Act (the act). The act essentially incorporated the language contained in the Uniform Condominium Act and was made applicable to any condominium created in Rhode Island after July 1, 1982. *See* § 34–36.1–1.02(a)(1). The condominium presently at issue was created in 1988; accordingly, the master declaration and its purported amendments are controlled by the act. The resolution of the issues raised in this appeal depends, for the most part, upon our statutory interpretation of the act, and whether the disputed master declaration and its amendments conform with that interpretation. First, we must address whether, as plaintiffs assert in their brief, "the Uniform Condominium Act is a consumer statute that regulates the terms under which condominiums are established and managed."

■■■ "We review *de novo* questions of statutory interpretation." *Interstate Navigation Co. v. Division of Public Utilities and Carrieres of the State of Rhode Island,* 824 A.2d 1282, 1287 (R.I.2003) (citing *Stebbins v. Wells,* 818 A.2d 711, 715 (R.I. 2003)). "When construing a statute 'our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.'" *Id.* (quoting *Oliveira v. Lombardi,* 794 A.2d 453, 457 (R.I.2002)). "In construing statutes, this Court 'adhere[s] to the basic proposition of establishing and effectuating the intent of the Legislature[, * * * which] is accomplished from an examination of the language, nature, and object of the statute.'" *In re Estate of Gervais,* 770 A.2d 877, 880 (R.I.2001) (per curiam) (quoting *State v. Pelz,* 765 A.2d 824, 829–30 (R.I.2001)). "If the language of a statute is clear on its face, then its plain meaning must generally be given effect." *Id.* (quoting *Skaling v. Aetna Insurance Co.,* 742 A.2d 282, 290 (R.I.1999)). Nonetheless, "[i]t is a well-known maxim of statutory interpretation that this Court 'will not construe a statute to reach an absurd [or unintended] result.'" *Id.* (quoting *Hargreaves v. Jack,* 750 A.2d 430, 435 (R.I.2000)).

When it enacted the act, the Legislature authorized and directed the secretary of state to insert the official comments to the Uniform Condominium Act (1980). Unless the statutory language clearly and expressly states otherwise, those comments are to be used as guidance concerning the legislative intent in adopting the chapter. *See* Compiler's Notes to § 34–36.1–1.01 (citing P.L.1982, ch. 329, § 3).[14] In addi-

---

**14.** Specifically, P.L.1982, ch. 329, § 3 provides:

"The secretary of state is hereby authorized and directed to print in the [G]eneral [L]aws following each section of this act,

tion, "any right or obligation declared by this chapter is enforceable by judicial proceeding" and the remedies "shall be liberally administered * * *." Section 34–36.1–1.12.

"The Act as a whole contains a strong consumer protection flavor * * *." *One Pacific Towers Homeowner's Association v. HAL Real Estate Investments, Inc.*, 148 Wash.2d 319, 61 P.3d 1094, 1100 (2002) (observing that the Washington Condominium Act significantly corresponds to the Uniform Condominium Act). That is because, "[o]ne of the reasons the Uniform Act was created was that there was a perceived need for additional consumer protection." *Id.* Furthermore, "[w]hen there exists a dominance of control by one owner, it becomes more important to allow minority owners greater participation in the administration of the commonly owned property, and increases the need for the majority owner to follow all the statutes and the declaration." *Artesani v. Glenwood Park Condominium Association*, 750 A.2d 961, 963 (R.I.2000) (per curiam).

 Section 34–36.1–1.04 states that, "[e]xcept as expressly provided in this chapter," any agreements to vary the provisions or waive the rights conferred by the statute are prohibited. *See also* Commissioners' Comment to § 34–36.1–1.04 (stating that "this section adopts the approach of prohibiting variation by agreement except in those cases where it is expressly permitted by the terms of the Act itself"). Consequently, "[i]n many instances * * * provisions of the Act may not be varied, because of the need to protect purchasers, lenders, and declarants." *Id.* "One of the consumer protections in this Act is the requirement for consent by

specified percentages of unit owners to particular actions or changes in the declaration." *Id.* Accordingly, "[i]n order to prevent declarants from evading these requirements by obtaining powers of attorney from all unit owners, or in some other fashion controlling the votes of unit owners, *this section forbids the use by a declarant of any device to evade the limitations or prohibitions of the Act or of the declaration." Id.* (Emphasis added.) The Rhode Island Condominium Act is a consumer protection statute.

## IV

### The Third, Fourth and Fifth Amendments

 The defendants appeal the hearing justice's determination that the Third, Fourth and Fifth Amendments were void *ab initio.* These amendments purportedly extended IDC's deadline to develop the South and West Development Units and to exercise its rights to the Reserved Area from December 31, 1994, to December 31, 1999. The defendants maintain that the amendments were approved validly through unanimous votes by the six master condominium unit owners in accordance with the act, and that the hearing justice erred in finding that statute required the unanimous consent of the sub-condominium unit owners. We disagree.

Section 34–36.1–2.17(d) provides:

"Except to the extent expressly permitted or required by other provisions of this chapter, no amendment may create or increase special declarant rights, increase the number of units, change the boundaries of any unit, the allocated interests of a unit, or the uses to which

---

the corresponding official comments as defined in the Uniform Condominium Act (1980) which *shall be used as guidance as to the intent of the [L]egislature in adopting*

*this chapter unless the statutory language shall clearly express otherwise* in which case the statutory language shall *prevail."* (Emphases added.)

any unit is restricted, in the absence of unanimous consent of the unit owners." [15]

Section 34–36.1–2.05(a)(8) provides that condominium declarations must contain:

"A description of any development rights and other special declarant rights * * * reserved by the declarant, together with a legally sufficient description of the real estate to which each of those rights applies, and *a time limit within which each of those rights must be exercised* [.]" (Emphasis added).

Special declarant rights are defined as:

"rights reserved for the benefit of a declarant to:

" * * *

"(ii) To exercise any development right (§ 34–36.1–2.10),

" * * *

"(vi) To make the condominium subject to a master association, (§ 34–36.1–2.20) * * *." Section 34–36.1–1.03(26).

The reserved right to develop both the South and West Development Units therefore constituted special declarant rights under the act. Consequently, any amendment to increase these special declarant rights, such as an extension of the time limit to exercise declarant's development rights, was subject to the unanimity requirements mandated by § 34–36.1–2.17(d).

According to the master declaration, the successor declarant (IDC Properties), retained development rights in the South and West Development Units, as well as its rights in the Reserved Area, until December 31, 1994. Since development rights are special declarant rights, it follows that any attempt to extend development rights was subject to the statutory requirement that unanimous consent of the owners be obtained pursuant to § 34–36.1–2.17(d).[16]

The defendants maintain that this unanimous consent requirement was fulfilled when the amendments were passed by a unanimous vote of the master condominium unit owners. They argue that the sub-condominium unit owners were represented at the relevant meetings by their sub-condominium board members. As previously noted, the master declaration defines a "unit owner" as "the Declarant or other person or persons owning a Unit of a Sub-Condominium * * *." Unlike the master declaration, however, the act makes no distinction between master condominium

---

**15.** The Commissioners' Comment to G.L.1956 § 34–36.1–2.17(d) provides that:

"Section [34–36.1–1.04] does not permit the declarant to use any device, such as powers of attorney executed by purchasers at closings, to circumvent subsection (d)'s requirement of unanimous consent."

**16.** The dissent contends that this conclusion was erroneous because § 34–36.1–2.20(d) "expressly provides that 'the rights and responsibilities of unit owners [with respect to the unit owners' association set forth in §§ 34–36.1–3.03, 34–36.1–3.08—34–36.1–3.10, and 34–36.1–3.12] apply in the conduct of the affairs of a master association only to those persons who elect the board of a master association.'"

We note, however, that although § 34–36.1–3.03 does permit the executive board to "act in all instances on behalf of the association[,]" it also provides for certain exceptions. One of those exceptions is that "[t]he executive board may not act on behalf of the association to amend the declaration (§ 34–36.1–2.17) * * *." Section 34–36.1–3.03(b). Considering that § 34–36.1–2.17(d) states that "no amendment may create or increase special declarant rights * * * in the absence of unanimous consent of the unit owners[,]" and considering that the actions taken here by the master association did, in fact, increase special declarant rights, the dissent's reliance upon § 34–36.1–2.20(d) to support the conclusion that the master association validly extended IDC's development rights is misplaced.

unit owners and sub-condominium unit owners. Instead, a "unit owner" is defined in the act as:

"a declarant or other person who owns a unit, or a lessee of a unit in a leasehold condominium whose lease expires simultaneously with any lease, the expiration or termination of which will remove the unit from the condominium, but does not include a person having an interest in a unit solely as security for an obligation." Section 34–36.1–1.03(29).

It is clear from the foregoing language that the owner of a sub-condominium unit constitutes a unit owner for purposes of the act. Under the act, unit owners are given the right to vote upon any amendments to special declarant rights; however, under the master declaration's definition of owners and unit owners, owners of a sub-condominium unit are prohibited from casting such votes except through the declarant-controlled master association. Considering the clear and unequivocal language of § 34–36.1–2.17(d) requiring unanimous consent to any increase of special declarant rights, coupled with the strong consumer protection aspect of that section, there is no doubt that the Legislature intended to protect plaintiffs, as unit owners, from amendments favoring the declarant made without their consent. Thus, we hold that the master declaration prohibition on voting is precisely the type of artifice or device that the statute proscribes and that the voting scheme at issue is inconsistent with the act.

The record reveals that even the master declaration itself contravened § 34–36.1–2.17(d) by permitting amendments to the special declarant rights through a vote of only 67 percent of the master condominium unit owners and sub-association board members rather than through the unanimous consent of the individual unit owners required by the statute. More importantly, however, the Third, Fourth and Fifth Amendments were passed without any votes from the individual unit owners because only the master condominium unit owners and the sub-association board members were permitted to vote to extend IDC Properties' special declarant rights. Furthermore, the record reveals that the individual unit owners did not even receive notice of the special meetings for purposes of discussing and voting upon the Third and Fourth Amendments.

Thus, we conclude that the voting procedure employed at the special meetings improperly deprived the individual unit owners of their statutory right to give consent. Consequently, the hearing justice did not err in declaring that the Third, Fourth and Fifth Amendments were void *ab initio* and that the declarant's development rights had expired after December 31, 1994.[17]

---

17. Another possible basis for declaring the Third and Fourth Amendments to be void would be the failure to provide notice of the relevant meetings to the individual unit owners. Section 34–36.1–3.08 provides that:

"Not less than ten (10) nor more that sixty (60) days in advance of any meeting, the secretary or other officer specified in the bylaws shall cause notice to be hand delivered or sent prepaid by United States mail to the mailing address of each unit or to any other mailing address designated in writing by the unit owner. The notice of any meeting must state the time and place of the meeting and the items on the agenda, including the general nature of any proposed amendment to the declaration or bylaws, any budget changes, and any proposal to remove a director or officer."

We observe that in the zoning context, "action taken by a board that has not satisfied the notice requirements is a nullity." *Ryan v. Zoning Board of Review of New Shoreham*, 656 A.2d 612, 615–16 (R.I.1995). *See also Gardner v. Cumberland Town Council*, 826 A.2d 972 (R.I.2003). Likewise, failure to give notice to a necessary party invalidates a tax

## V

### The Reserved Area

Under the terms of the master declaration, the land underlying the Reserved Area was converted into a master common element subject either to conversion into a limited master common element or to complete withdrawal from the GIS Condominium on or before December 31, 1994. Conversion into a limited master common element would transform the airspace above the land into a declarant-owned master unit with associated development rights. On December 29, 1994, the declarant recorded the Sixth Amendment making such a conversion.[18]

The plaintiffs do not challenge the propriety of the Sixth Amendment, maintaining that defendants had a unilateral right to convert the Reserved Area from a master common element into a limited master common element with associated development rights. However, as with the development rights in the South and West Development Units, we believe that those rights automatically expired when the declarant failed to exercise them on or before December 31, 1994.

## VI

### Ownership of the Disputed Parcels

Now that it has been determined that IDC's development rights expired after December 31, 1994, the next issue to be addressed is the ownership of the disputed parcels of land. The plaintiffs maintain that because all of the parcels were common elements in the GIS Condominium, title to the parcels had always vested in the unit owners subject to divestment by the declarant through the proper exercise of its development rights. They contend that when the declarant's development rights expired, its interests in the parcels ceased to exist and that, consequently, the hearing justice erred in failing to declare that title to the parcels was vested in the unit owners in fee simple.

The defendants contest these claims. They assert that the disputed parcels of land were, and still are, limited master common elements allocated for the exclusive use of the declarant-owned master units that occupy the above airspace.[19] They maintain that such master units constitute real estate under the act and that even if the declarant's development rights expired after December 31, 1994, its improvement rights in its master units did not, and could not, expire. In other words, even if its rights to develop had ceased, it

---

sale. *See Kildeer Realty v. Brewster Realty Corp.*, 826 A.2d 961, 966 (R.I.2003).

**18.** The amendment also redistributed the percentage master allocated interests of each existing master unit. The changes are reflected as follows:

| | Pre-Sixth Amendment | Post Sixth Amendment |
|---|---|---|
| (1) Harbor Houses | 21.42 percent | 11.55 percent |
| (2) America | 19.25 percent | 10.39 percent |
| (3) Capella South | 39.61 percent | 21.35 percent |
| (4) South Development Unit | 9.6 percent | 7.31 percent |
| (5) West Development Unit | 10.12 percent | 3.31 percent |
| (6) North Development Unit (Reserved Area) | - | 46.09 percent |

**19.** We are puzzled by the dissent's statement that "even if the development rights expired, IDC still owned these units in fee simple." At no time have defendants ever asserted that they own the land underlying the master units in fee simple.

maintained its right to improve the real estate in its capacity as owner.

Development rights are defined as:

"any right or combination of rights reserved by a declarant in the declaration to:

"(A) Add real estate to a condominium,

"(B) Create units, common elements, or limited common elements within a condominium,

"(C) Subdivide units or convert units into common elements, or

"(D) Withdraw real estate from a condominium." Section 34–36.1–1.03(11).

Under the act, "real estate" is:

"any leasehold or other estate or interest in, over, or under land, including structures, fixtures, and other improvements and interests which by custom, usage, or law pass with a conveyance of land though not described in the contract of sale or instrument of conveyance. 'Real estate' includes parcels with or without upper or lower boundaries, and spaces that may be filled with air or water." Section 34–36.1–1.03(24).

The defendants contend that, according to the act, ownership of a master unit necessarily is ownership of real estate because it constitutes an interest in the airspace over the land. They maintain that the construction of a building within a master unit merely represents an improvement to the real estate and does not, therefore, fit within the statutory definition of a development right.

Even if we were to accept defendants' assertion that a master unit in the airspace above a third-party owned unimproved lot with development rights is, in fact, real estate for purposes of the Act,[20] we do not accept their tortured conclusion that the construction of a building upon that lot is merely an improvement, rather than the exercise of a development right. Indeed, such an "improvement" constitutes one of the specific development rights reserved in the master agreement. Because the declarant's proposed construction effectively would subdivide the so-called master unit into smaller residential units, it falls squarely within § 34–36.1–1.03(11)(B)'s definition of development rights. As discussed above, those rights expired after December 31, 1994.

▬▬ Under the master declaration, the GIS Condominium consists of one large tract of land. Although defendants assert that the condominium is composed of separate lots, nothing in the record suggests that the parcel is divisible or contains more than one legal lot. *See Dibiase v. Jacovowitz*, 43 Mass.App.Ct. 361, 682 N.E.2d 1382, 1383 (1997). The master declaration granted the declarant a limited period to develop certain parcels of land within the condominium, but it could not convey title to the airspace if the development rights were not exercised. Because the master declaration "described the entire parcel of land from the outset, * * * the entire parcel * * * was common area from the time the master [declaration] was recorded * * *." *Id.* at 1385.[21] Thereafter, the land never was subdivided and when the development rights expired, the disputed portions vested in fee simple in "the unit owners as tenants in common in proportion to their respective undivided

---

**20.** We have recognized that, under appropriate circumstances, a condominium may be developed in the airspace above land pursuant to the Condominium Act. *See McConnell v. Wilson*, 543 A.2d 249 (R.I.1988).

**21.** According to the master declaration, the Reserved Area also consisted of common area. The Sixth Amendment merely converted the parcel from a master common element into a limited master common element.

interests." *Id.* Considering that all the underlying land constituted common property, we conclude that when the associated development rights expired, so also did all of the declarant's rights in the master units. Accordingly, the hearing justice should have declared that title to the disputed property vested in the individual unit owners in fee simple.[22]

## VII

### The Statute of Limitations

The defendants maintain that plaintiffs' challenge to the amendments was not timely filed pursuant to § 34–36.1–2.17(b); accordingly, they assert that the claim should have been dismissed for failure to comply with the one-year statute of limitation.

In her decision, the hearing justice rejected this claim. She noted that section 34–36.1–2.17(b) prohibited any increase in special declarant's rights without the unanimous consent of the unit owners and that because "the challenged amendment was not adopted in conformance with the procedures" set out by the statute, the statute of limitations did not apply. Instead, she found plaintiffs' action to be timely pursuant to § 9–1–13(a), which has a ten-year limitation period for civil actions. Although we affirm the hearing justice on this issue, we do so on a ground different to that enunciated by the hearing justice. *See United Lending Corp.*, 827 A.2d at 634.

 Section 34–36.1–2.17(b) provides that:

"No action to challenge the validity of an amendment adopted by the association pursuant to this section may be brought

more than one year after the amendment is recorded."

However, when, as here, the amendment being challenged is determined to be void *ab initio*, the one-year statute of limitations does not apply to any subsequent action taken by an interested party. *See Theta Properties v. Ronci Realty Co.*, 814 A.2d 907 (R.I.2003). Consequently, the hearing justice did not err in rejecting defendants' statute of limitations defense.

## VIII

### The Laches Defense

The defendants have also raised the affirmative defense of laches in the proceedings below, contending that this doctrine should bar plaintiffs' challenge to the Reserved Area because the plaintiffs sat on their rights while defendants invested heavily in developing the parcel into a function center known as the Newport Regatta Club. The hearing justice rejected defendants' assertions, finding that the claim was precluded by the tolling agreement that was willingly entered into by the parties. The defendants assert that the hearing justice erred in denying their laches defense because it was not waived by the tolling agreement.

 "Laches is an equitable defense that involves not only delay but also a party's detrimental reliance on the status quo." *Adam v. Adam*, 624 A.2d 1093, 1096 (R.I.1993) (citing *Grissom v. Pawtucket Trust Co.*, 559 A.2d 1065 (R.I.1989)). "Mere delay alone is not enough, the delay must be unreasonable." *Adam*, 624 A.2d at 1096. That is because,

**22.** By individual unit owners, we include all the individuals who own sub-condominiums, so-called, not unit owners, as defendants restrict that term. Such individuals include

plaintiffs in this case, as well as IDC in its capacity as the owner of several sub-condominiums.

"Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes, but when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief." Id. (quoting *Chase v. Chase*, 20 R.I. 202, 203–04, 37 A. 804, 805 (1897)).

▇▇▇▇ Although defendants correctly assert that they did not waive laches as an affirmative defense when they signed the tolling agreement, they cannot avail themselves of that defense under the circumstances in this case. The record reveals that defendants knowingly and willingly entered into the tolling agreement and thereafter agreed to extend it on three separate occasions. The original tolling agreement provided that any legal action filed by the parties on or before June 30, 1998, with respect to the creation of, amendment to, and operation of the condominium property, would be deemed to "have been commenced, filed and served, for purposes of statute of limitations, laches, waiver, estoppel or similar defenses, on December 1, 1997." The final agreement continued the applicability of the presumed December 1, 1997 filing date to all actions filed on or before May 31, 1999.

Despite the fact that the tolling agreement specifically acknowledged and contemplated the possibility that plaintiffs might file the instant civil suit, and while the agreement was still in full force and effect, defendants knowingly invested substantial sums of money in the Reserved Area by constructing the Newport Regatta Club in 1998. Given that fact, defendants cannot now contend that the present action, filed on May 28, 1999, constituted an unreasonable delay upon which they detrimentally relied for purposes of invoking the laches doctrine as an affirmative defense. Consequently, the hearing justice properly rejected defendants' argument on this issue.

## IX

### Accounting

The defendants contend that they continued to pay common expenses on the disputed parcels after the December 31, 1994 development rights deadline had passed and the property vested in the unit owners in fee simple.[23] Furthermore, they assert that they made a considerable investment in developing the Newport Regatta Club. The defendants now maintain that these financial considerations should weigh heavily in their favor because, otherwise, plaintiffs would benefit from a considerable and inequitable windfall should they prevail upon appeal.

▇▇▇▇ We have stated previously that "[o]ne who knows of a claim to land which he [or she] proposes to use as his [or her] own, proceeds at his [or her] peril if he [or she] goes forward in the face of protest from the claimant and places structures

---

**23.** Before the declarant's development rights expired, the declarant was liable under the act for all the expenses associated with the parcels that were subject to said development rights. *See* § 34–36.1–3.07(b).

upon the land." *Renaissance Development Corp. v. Universal Properties Group, Inc.*, 821 A.2d 233, 238 (R.I.2003) (citing *Ariola v. Nigro*, 16 Ill.2d 46, 156 N.E.2d 536, 540 (1959)). That is because "the duty of the courts is to protect rights, and innocent complainants cannot be required to suffer the loss of their rights because of the expense to the wrongdoer." *Id.* In reviewing defendants' assertions that plaintiffs should not benefit from defendants' development of the Newport Regatta Club, we observe that defendants commenced such development with full knowledge of plaintiffs' claims and after they voluntarily entered into the tolling agreement. Considering that they developed the Reserved Area at a time when they were on notice that their right to do so was in dispute, we conclude that they constructed the parcel at their peril and cannot now contend that equity should prevent plaintiffs from prevailing because of their expenditures.

However, with respect to the defendants' payments of common expenses on the disputed parcels after the declarant's development rights had expired, we concur that to permit the plaintiffs to enjoy the benefits of such expenditures would constitute an inequitable windfall. However, we do not agree that this should form the basis for denying the plaintiffs' appeal and, instead, we remand the matter to the Superior Court for an accounting on this issue.[24]

## X

### Conclusion

Consequently, and for the foregoing reasons, the plaintiffs' cross-appeal is granted and the defendants' cross-appeal is denied. The papers are remanded for the entry of a partial judgment consistent with this opinion and for a trial on the remaining issues.

FLANDERS, Justice, dissenting.

Most respectfully, and with the utmost regret for having to say so, I am of the opinion that the majority's decision in this case repeatedly misinterprets the Rhode Island Condominium Act (act), G.L.1956 chapter 36.1 of title 34. It does so:

(1) By allowing the plaintiff condominium associations to maintain this lawsuit challenging the validity of amendments to a condominium declaration even though they failed to file this action until long after the one-year period for doing so expired under the applicable statute of limitations;

(2) By holding that individual unit owners—whose condominium associations were part of a master condominium association, but who were not entitled to elect the executive board of that master association or to vote on other master association matters—nevertheless were entitled to vote on proposed amendments to the condominium declaration for the master association, even though the act expressly provides that "[t]he rights and responsibilities of unit owners * * * apply in the conduct of the affairs of a master association only to those persons who elect the board of a master association." Section 34–36.1–2.20(d); and

(3) By unjustifiably divesting defendants (collectively, IDC), of the three condominium units that they own in the GIS master condominium, and by judicially converting those units—including a unit

---

**24.** This accounting is confined to the common expenses paid by defendants on the master units after the expiration of their development rights on December 31, 1994. It does not include any profits that the defendants may have earned from its operation of the Newport Regatta Club.

containing a multimillion-dollar commercial banquet facility and regatta club located on prime waterfront property—into property owned by individual condominium unit owners in other condominiums, merely because in 1994 IDC supposedly failed to exercise or extend its development rights in a technically proper manner when acting in its capacity as the declarant of the GIS condominium.

As amplified below, I believe that the majority's erroneous holdings in this case stem from its efforts to advance what it believes to be the interests of "consumer protection" in connection with condominium developments such as this one. Proclaiming that the voting procedures used by the GIS master condominium association to adopt the challenged amendments to the GIS condominium declaration were "precisely the type of artifice or device that the [condominium] statute proscribes," the majority overlooks the fact that the applicable condominium law expressly allowed the GIS master association to use such voting procedures and for IDC to acquire, develop, operate, and improve the GIS condominium exactly as it has proceeded to do in this case.

## I

### The Act's One–Year Statute of Limitations Barred the Plaintiffs' Claims Challenging the Validity of the 1994 Amendments to the GIS Condominium Declaration

IDC recorded the Fifth Amendment to the GIS declaration on December 29, 1994. The plaintiffs did not file this action challenging its validity until May 29, 1999, approximately four years and five months after the applicable one-year statute of limitations period expired. *See* § 34–36.1–2.17(b) ("No action to challenge the validity of an amendment adopted by the association pursuant to this section may be brought more than one year after the amendment is recorded.").

Assuming, *arguendo*, that the parties' tolling agreement—deeming this action to have been filed on December 1, 1997—was valid and enforceable, it still would avail plaintiffs nothing because the stipulated filing date of December 1, 1997, occurred more than one year after IDC publicly filed the last of the challenged 1994 amendments to the GIS condominium declaration.

The majority's opinion simply disposes of this one-year statute of limitations by declaring that actions challenging the validity of amendments that are alleged to be invalid *ab initio* are not subject to the one-year limitation period specified in the act for challenging the validity of amendments. As legal authority for this remarkable conclusion, the majority cites to our recent decision in *Theta Properties v. Ronci Realty Co.*, 814 A.2d 907 (R.I.2003) (*Theta*), even though that case provides no support whatsoever for such a proposition.

*Theta* holds that service of process on a dissolved corporation after the statutory period for doing so had expired is void *ab initio* and that the period to accomplish such service of process cannot be extended by retroactive legislation enacted after the statutory period for initiating such service has expired. *Theta*, 814 A.2d at 913. But *Theta* provides no support whatsoever for the proposition that claims challenging the validity of amendments to a condominium declaration, which are alleged to be void *ab initio*, are exempt from the applicable statute of limitations. Indeed, if *Theta* has any application whatsoever to this case—and it has none—it would be that, after a statutory period for suing a party has expired, any attempt to do so should be declared void *ab initio* and deemed of no legal consequence whatsoever—at least

when, as here, defendants have invoked this defense in their answer and vigorously argued it to the trial court and to this Court. Thus, based on *Theta* and on other cases holding that the expiration of an applicable statute of limitations is a valuable property right that cannot be revived on an *ex post facto* basis, plaintiffs' attempt to sue IDC based on the alleged invalidity of the 1994 amendments should have been declared void *ab initio*.

I have great difficulty with the majority's holding to the contrary on this point. Is not a claim alleging that an amendment to a condominium declaration is void *ab initio* a claim that challenges the validity of the amendment? Is not a claim alleging that an amendment is void because it was adopted in a procedurally invalid manner a claim challenging the validity of the amendment? If a claim that an amendment is void *ab initio* is not subject to the one-year period for filing claims challenging the validity of an amendment, then what type of claim challenging the validity of an amendment is subject to the one-year period?

Just to pose such questions is to expose the underlying problem with the Court's holding that plaintiffs' claims challenging the validity of amendments that are alleged to be void *ab initio* are exempt from the act's one-year period for challenging the validity of amendments to condominium declarations.

But this is not simply a matter of logic and of interpreting statutes according to their plain meaning. The interests of basic fairness also argue in favor of applying the one-year statute of limitations period to bar these claims. Although plaintiffs were fully aware in 1994 of the fact that they needed to attack the validity of these amendments within one year of their recording, their board representatives voted in favor of the amendments while the asso-

ciations sat on their hands until May 1999 without taking any legal action to invalidate them. In the interim, while they dawdled and while they obtained the benefit of the many thousands of dollars in condominium fees paid by IDC as the owner of three of these master GIS condominium units, IDC justifiably acted in reliance for years on the validity of the amendments in question. In its separate capacities as the declarant of the GIS condominium and as the owner of various condominium units on Goat Island, IDC sold condominium units, acquired ownership interests in units, approved budgets, maintained common areas, paid assessments, granted mortgages to banks, and committed millions of dollars toward building, opening, and operating the Newport Regatta Club on the premises of the north, or reserved, master unit of the GIS condominium.

Thus, even if the applicable statute of limitations had not expired many years before plaintiffs filed this lawsuit, the doctrine of laches would appear to estop them from challenging the validity of these amendments. So many changes in position have occurred—affecting so many people and so many financial institutions and so much invested capital—that it is grossly unfair and unjust for plaintiffs to be allowed to undo all that has happened at this project with respect to the property involved so long after their representatives voted in favor of the amendments and the GIS master association lawfully adopted them.

> "So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to

his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right." *Pukas v. Pukas,* 104 R.I. 542, 546, 247 A.2d 427, 429 (1968) (quoting *Chase v. Chase,* 20 R.I. 202, 204, 37 A. 804, 805 (1897)).

The majority counters this suggestion of laches by referring to the fact that IDC proceeded to build the Regatta Club on the north unit in 1998—knowing that plaintiffs still might file a lawsuit at some later date that would challenge IDC's right to do so as of December 1, 1997. But even December 1, 1997 was more than two years after the one-year statute of limitations for filing such an action had expired and more than three years after the GIS master association adopted the amendments in question! Moreover, plaintiffs have not challenged the validity of the amendment that created the unit on which the Regatta Club sits and that vested IDC with ownership of that unit. Thus, even if the one-year statute of limitations did not bar plaintiffs' claims, which it clearly did, I still would reverse and remand this case for trial to decide whether IDC so changed its position in reliance on the validity of the amendments that it would be inequitable to allow plaintiffs to maintain this lawsuit as if it had been filed on December 1, 1997.

## II

**Because the Voting Procedures Used to Adopt the 1994 Amendments to the GIS Condominium Declaration Were Valid, IDC Lawfully Extended Its Development Rights to December 31, 2015**

In 1994, representatives of the five master units comprising the GIS condominium association attended GIS master association meetings at which they voted on and unanimously approved, *inter alia,* the

Third, Fourth, and Fifth Amendments to the GIS condominium declaration. Three of these units were multi-unit condominiums governed by executive boards of the plaintiff condominium associations. Each of the plaintiff condominium associations, through its board representatives, received notice of the GIS master association meetings and voted in favor of the proposed amendments. Nevertheless, the majority holds that these amendments were invalid and void *ab initio* because the owners of individual sub-condominium units in the America, Capella, and Harbor Houses condominiums were not given any direct notice of or opportunity to vote on such amendments. Consequently, says the majority, IDC never lawfully extended its development rights for the GIS condominium beyond December 31, 1994, the date when they were scheduled to expire under the First Amended and Restated Declaration of Condominium, GIS.

The majority's rationale for this holding is that each of the more than 150 individual owners of the condominium units located in the America, Capella, and Harbor House condominiums (the so-called sub-condominium owners) failed to receive individual notice or the individual opportunity to cast a direct vote on whether to adopt the challenged amendments to the GIS condominium declaration. But given the undisputable·fact that none of these individual owners of sub-condominium units owned or controlled any of the GIS master units, and given that they were not entitled to elect the board of the GIS master association when those votes occurred—much less to vote on amendments to a different condominium declaration from the one in which they owned one or more units—this was scarcely remarkable, let alone an actionable violation of the act. What the majority chooses to ignore in its analysis of the votes on the 1994 amend-

ments to the GIS condominium declaration is that the GIS condominium was organized as a master association, as § 34–36.1–2.20 of the act expressly authorized. As such, its five master condominium units composed a master condominium association whose representatives elected a master condominium executive board and held master association meetings at which, *inter alia*, they voted on and adopted amendments to the GIS condominium declaration. Thus, pursuant to § 34–36.1–2.20(d),

"[t]he rights and responsibilities of unit owners with respect to the unit owners' association set forth in §§ 34–36.1–3.03 [executive board members], 34–36.1–3.08—34–36.1–3.10 [meetings, quorums, and voting] and 34–36.1–3.12 [conveyance or encumbrance of common elements] apply in the conduct of the affairs of a master association *only to those persons who elect the board of a master association, whether or not those persons are otherwise unit owners within the meaning of this [act]*." (Emphasis added.)

In other words, in master associations such as the one created for the GIS condominium, "the rights of notice, voting, and other rights enumerated in the [a]ct are available only to the persons who actually elect the [master association] board." Commissioners' Comment 5 to § 34–36.1–2.20(d) of the act. With respect to the GIS master association, those persons were IDC, the owner of two of the GIS condominium master units, and, in the case of the GIS master units consisting of the America, Capella, and Harbor House condominiums, a representative of each condominium association's executive board, with each master unit's representative being entitled to cast one undivided vote, weighted according to the size of the land area that each master unit encompassed. Such a representative voting arrangement for the GIS master condominium association

and GIS master units is entirely consistent with and permitted by the act—especially given the fact that three of the GIS master units were themselves condominiums owned by multiple individual owners of units in these condominiums. Thus, § 34–36.1–3.10(a), entitled "Voting," provides:

"If only one of the multiple owners of a unit is present at a meeting of the [condominium] association, that person is entitled to cast all *the votes allocated to that unit.* If more than one of the multiple owners are present, the votes allocated to that unit may be cast only in accordance with the agreement of a majority in interest of the multiple owners, *unless the declaration expressly provides otherwise.*" (Emphases added.)

Several points should be noted with respect to this provision. First, it expressly acknowledges the fact that voting does not have to proceed on a one-vote-per-unit basis, which the majority deems to be required. Rather, it contemplates that the condominium declaration may provide for the manner in which "votes [are] allocated to that unit." Second, the act speaks to *who* is entitled to cast the votes allocated to multi-owner units in a given condominium, such as the three master units in the GIS condominium, (namely, the America, Capella, and Harbor Houses condominiums). Multiple sub-condominium unit owners owned these three master units of the GIS condominium when the votes in question were cast in 1994 at the GIS master association meetings in favor of the various amendments to the GIS declaration. Most significantly, given that more than one of the multiple unit owners of the America, Capella, and Harbor Houses master units were present at the challenged meetings of the GIS condominium association, "the votes allocated to that unit [by the declaration] may be cast only in accordance with the agreement of a

majority in interest of the multiple owners, *unless the declaration expressly provides otherwise."* Section 34–36.1–3.10(a). (Emphasis added.) Here, the declaration expressly provided otherwise, stating that each master unit in the GIS condominium would be entitled to cast one undivided vote weighted according to the land area covered by each unit.

Thus, far from "evad[ing] the limitations or prohibitions of [the act]," which § 34–36.1–1.04 forbids declarants from doing, Globe Manufacturing, the original declarant of the GIS condominium declaration, was entitled by the act to prescribe a representative voting procedure for multiple unit owners of a single master unit in the GIS master condominium association. Indeed, the Commissioners' Comments to § 34–36.1–1.04 specifically describe the voting requirements in § 34–36.1–2.20 (master associations) as one of the provisions in the act that can be varied by the declaration. Even § 34–36.1–2.17(d), providing that amendments to declarations that enlarge special declarant rights require the unanimous consent of the unit owners, contains an exception allowing contrary voting arrangements "to the extent expressly permitted or required by other provisions of this [act]." Section 34–36.1–2.20, pertaining to the voting requirements for master associations, is one such provision.

For these reasons, the individual subunit owners of the plaintiff condominium associations were not entitled to cast individual votes on amendments to the GIS declaration. What the majority fails to acknowledge is that, even though

"[a] variety of sections [of the act] enumerated in subsection [§ 34–36.1–2.20](d) provide certain rights and powers to unit owners in their dealings with their [condominium] association[,][*i*]*n the affairs of the master association,*

however, *it would be incongruous for the unit owners to maintain those same rights if those unit owners were not in fact electing the master board.* Thus, for example, the question of election of directors, meetings, notice of meetings, quorums, and other matters enumerated in those sections would have little meaning if those sections were read literally when applied to a master board which was not elected by all members of the condominiums subject to the master board. For that reason, *the rights of notice, voting, and other rights enumerated in the [a]ct are available only to the persons who actually elect the [master] board."* Commissioners' Comment 5 to § 34–36.1–2.20(d). (Emphases added.)

Apparently finding the above-described incongruity no bar to extending such rights to other persons, the majority proceeds to accord voting rights in master associations such as GIS not just to the persons who elect the GIS master board, but also to each and every sub-condominium unit owner on Goat Island. In sum, then, the majority's opinion pays no heed to the fact that, under the act, special voting rules apply to master condominium associations such as the one created for the GIS condominium. Sinking into the quicksand of voting provisions that are simply inapplicable under the act to master associations, the majority fails to acknowledge the existence of these master-association provisions and their related commentary, let alone the dispositive fact that the GIS condominium was organized as a master association. Instead, it proceeds to affirm the Superior Court's invalidation of votes that were taken in complete accord with the act and with its voting provisions dealing with master condominium associations such as this one.

In the end, only by ignoring the fact that, when the votes in question occurred in 1994, the GIS condominium was in fact organized as a master condominium association, comprising five different master units (three existing condominiums owned by multiple owners of individual units in these condominiums and two undeveloped parcels owned by IDC), can the majority conclude that the votes in question were void *ab initio*—even though the owners of individual units in different condominiums from the GIS condominium were not entitled by law to vote on these amendments to the GIS master declaration and even though the boards of the plaintiff associations cast their votes in favor of the amendments.[25]

The trouble I have with the majority's holding becomes clear with just a moment's reflection upon the factual circumstances of this case:

- Under the provisions of the act and the relevant condominium documents, the owners of sub-condominium units within the America, Capella, and Harbor Houses condominiums never were entitled to cast individual votes on matters pertaining to the GIS condominium and its master association. Therefore, by what rationale or authority can they possibly be entitled to individual votes at master association meetings in connection with amend-

ments to the declaration for the GIS condominium?

- The GIS condominium declaration did not create the units in the America, Capella, and Harbor Houses condominiums; rather, the declarations for plaintiffs' separate condominium associations created them.

- Neither the act nor any condominium declaration ever afforded the sub-condominium unit owners any individual voting rights with respect to the GIS condominium, the GIS master condominium association, or the GIS condominium declaration. On the contrary, the relevant condominium documents and applicable provisions of the act always informed plaintiffs and any sub-condominium unit owners that they were not entitled to cast individual votes on GIS condominium and master association matters.

- Sub-condominium unit owners paid no condominium fees with respect to any such privileges that belonged to the persons who were entitled to vote on GIS master association matters.

If the majority were correct in its conclusion that the 1994 votes to amend the GIS declaration were void *ab initio* because more than 150 sub-condominium unit owners were entitled to a direct individual

---

25. The majority points to G.L.1956 § 34–36.1–3.03(b), which provides that "[t]he executive board may not act on behalf of the association to amend the declaration." In this case, however, the executive board of the GIS condominium did not act on behalf of the GIS master association to amend the GIS condominium declaration. Rather, as provided in § 34–36.1–2.20(d), the persons entitled to elect the executive board of the GIS master association did so when they unanimously approved the amendments in question. Most importantly, § 34–36.1–2.20(d) expressly provides that "[t]he rights and responsibilities of unit owners with respect to the unit owners'

association set forth in § 34–36.1–3.03 * * * apply in the conduct of the affairs of the master association only to those persons who elect the board of a master association." Thus, § 34–36.1–3.03(b) (providing that the executive board may not act on behalf of the association to amend the declaration) was inapplicable to the unit owners of the plaintiff condominium associations because they were not entitled to elect the board of the GIS master association and the voting on the 1994 amendments to the GIS declaration occurred in connection with "the conduct of the affairs of the master association." Section 34–36.1–2.20(d).

vote thereon, then every vote taken by the GIS master condominium association for the last fourteen years—including every election that has been conducted, every budget that has been approved, and every amendment to the GIS declaration from day one—is also void *ab initio*. Ironically, because (according to the majority) the one-year statute of limitations does not apply to lawsuits asserting that amendments to condominium declarations were void *ab initio*, this means that only the original declaration for the GIS condominium—providing for the declarant's development rights to expire in 2037—remains intact, thereby mooting plaintiffs' efforts to stymie IDC from developing the property it owns on Goat Island.

In sum, I would hold that IDC duly extended its development rights to the year 2015 with respect to the master units it owns in the GIS condominium because the 1994 amendments that extended those rights received the unanimous consent of the representatives of the GIS master unit owners, including the plaintiffs who were among "those persons who elect the board of [the GIS] master association." Section 34–36.1–2.20(d). Thus, I would reverse the Superior Court judgment finding that their votes were void *ab initio*.

### III

**Even If Defendants' Development Rights Had Expired in 1994, They Still Were Entitled to Construct Improvements on Their Three Units; In Any Event, There Is No Justification for Holding That the Expiration of a Declarant's Development Rights Means That the Declarant Forfeits Its Ownership in Any Units That Were Subject to Such Rights to Other Unit Owners in the Condominium**

Even if IDC's development rights had expired in 1994, it was still entitled under the act to construct improvements within the three GIS condominium units that it owned. *See* § 34–36.1–2.11 (allowing unit owners to construct improvements to their units). In any event, there is no justification whatsoever for the majority's holding that the expiration of IDC's development rights means that it forfeited its fee simple ownership of those units that were the subject of such development rights and that legal title to such units should be transferred to the individual unit owners of plaintiffs' condominium associations.

As unjustified and as bewildering as are the majority's rulings on the validity of the amendments to the GIS declaration and on the timeliness of plaintiffs' claims challenging their validity, by far the most egregious and unsupportable portion of the majority's opinion concerns the draconian consequences it visits on defendants for not properly extending or exercising their development rights before they supposedly expired (as the majority now decrees in 2004) on December 31, 1994. Here we are, ten years down the road from the date when the majority says that IDC's development rights expired. The majority now holds that, because these rights expired in 1994, IDC—per the majority's *ipse dixit*— no longer owns the north, south, and west master units, much less any improvements it constructed thereon, that are part of the GIS master condominium. In summarily divesting IDC of its Goat Island property, including the Regatta Club, one of Newport's crown-jewel properties, without awarding it any just compensation—an action that can only be described as unwarranted—the majority has bestowed this award on litigants who are not entitled to such a remedy.

Even the trial justice could not bring herself to order the confiscatory relief that the majority now decrees. Moreover, the

explanations the Court proffers have no basis in the act.

The declaration is the fundamental legal document that establishes who owns what in a condominium. Even without the challenged amendments, the GIS condominium declaration always has provided that the master units in that condominium would be individually and privately owned and that this private ownership would be of a "permanent character" and not part of the condominium's common elements. Indeed, the GIS declaration expressly excluded the GIS master units from its definition of what constitutes the master-common elements. Moreover, nothing in the act or in the GIS declaration permits one or more of the multiple owners of a master unit to confiscate another master unit owner's property or units and convert them into master common elements at the condominium, let alone convert them into the private property of the other unit or sub-unit owners.

In this case, when IDC purchased Globe's rights in the GIS condominium in 1994, it acquired not only the ownership of its two master units in that condominium, but also Globe's contractual development rights as the declarant. Thus, even if IDC had lost all its contractual development rights because it failed either to exercise or extend them in a proper fashion, it still retained its ownership of the two master units that it purchased from Globe in 1994, plus the one it acquired in 1994 via the unchallenged Sixth Amendment to the GIS condominium declaration (namely, the north development unit). Consequently, it still possessed, under the act, the same right to construct improvements within the boundaries of those units that any other unit owner possessed. *See* § 34–36.1–2.11 (allowing unit owners to make "any improvements or alterations to * * * [the] unit that do not impair the structural in-

tegrity or mechanical systems or lessen the support of any portion of the condominium"). In this case, IDC's three master units cover over 56 percent of the land within the GIS condominium.

The majority's opinion conflates a declarant's development right of "[a]dd[ing] real estate to a condominium," § 34–36.1–1.03(11)(A), with a condominium unit owner's right under § 34–36.1–2.11 to construct improvements or build any structures wholly within the boundaries of a single condominium unit. First of all, even if such improvements or alterations to the unit constituted the addition of real estate to the condominium, § 34–36.1–2.11 still allows a unit owner to do so. The fact that the unit owner may also be a declarant whose development rights have expired is irrelevant. Under the act, a unit owner is defined as "a declarant or other person who owns a unit." Section 34–36.1–1.03(29). Thus, there can be no question that a declarant such as IDC can also be a unit owner under the act. Here, the GIS declaration defined an "owner" as "the Declarant or other person or persons owning a master unit." Thus, in its capacity as a unit owner and pursuant to § 34–36.1–2.11 and the GIS declaration, IDC was entitled to construct improvements on the units it owned even if it never had the right to exercise any development rights whatsoever.

Second, improving a unit by building on and within the unit does not add real estate to the condominium. Unlike most physical improvement projects, to exercise a development right a declarant must amend the declaration for the condominium because the exercise of such a right changes the legal rights and ownership interests of the other condominium-unit owners. *See* § 34–36.1–2.10. But an individual unit owner does not add real estate to the condominium itself merely by con-

structing a building, a retaining wall, or other physical improvements within that unit's existing real estate.

Thus, even though any existing buildings when a unit is created are part of the unit's real estate, constructed additions, buildings, and improvements to a vacant parcel of property or to an existing structure do not constitute the addition of real estate to the condominium. The real estate area comprising the unit remains the same both before and after the improvements are constructed. Thus, the mere construction of a building or other improvements within a unit does not constitute the exercise of a development right because they do not add real estate to the condominium within the meaning of the act. Otherwise, every time a condominium unit owner remodeled a kitchen, put up a dividing wall, or enlarged a patio, he or she would be adding real estate to the condominium and therefore exercising a development right.

Significantly, the act grants to unit owners such as IDC the broad power to "make any improvements or alterations to his or her unit that do not impair the structural integrity or mechanical systems or lessen the support of any portion of the condominium." Section 34–36.1–2.11(1). Although this unquestioned right to "make any improvements or alterations to his or her unit" is subject to the provisions of the condominium's declaration and to other provisions of law (such as zoning and other municipal land-use requirements), in this case the GIS declaration expressly afforded to IDC and to every other owner of a master-condominium unit the right to "construct buildings and other improvements * * * within the boundaries of [their units]." In addition, the GIS public offering statement provided that "[a]ny * * * Owner of a Master Unit may make alterations or construct improvements within the boundaries of its Master Unit." Thus, plaintiffs and the individual sub-condominium owners were notified in no uncertain terms that IDC, in its capacity as the existing and potential owner of several GIS condominium master units, reserved the right to construct "buildings and other improvements on any master unit * * * so long as the Declarant owns the Master Unit."

In short, development rights are entirely separate and distinct from the rights of unit owners to build on and improve their individually owned units. Nevertheless, the majority confuses the right of a declarant to exercise reserved development rights in connection with a condominium—for example, by constructing improvements on land it does not own, by adding or taking away real estate from a condominium, or by creating additional units—with the right of a unit owner (who can also be a declarant) to build upon and improve his, her, or its own individual and preexisting condominium units. Thus, the fact that a declarant's development rights have expired—or, indeed, even if such rights never existed—has no bearing upon the fundamental right of individual condominium unit owners, including a declarant, to improve and build on their separately owned units.

In sum, an individual unit owner's right to construct upon and improve that owner's condominium unit does not constitute the addition of real estate to a condominium that would fall within the statutory definition of a development right. *See* § 34–36.1–1.03(ii)(A) (development rights defined, in part, as "any right or combination of rights reserved by a declarant * * * to * * * [a]dd real estate to a condominium"). The improvement to the interior of a particular existing condominium unit does not alter any common areas or affect the other unit owners' ownership

interests in the condominium. Thus, subject to any limitations in the declaration and to applicable zoning and land-use laws, individual condominium unit owners possess the right to improve their property exclusively within the boundaries of the unit without reference to the existence or expiration of any statutorily defined or contractual development rights.

In this case, IDC's construction of the Newport Regatta Club totally within the reserved area (that is, within the north master condominium unit) had no effect whatsoever on the voting rights, condominium fees, ownership interests, or any other legal rights of plaintiffs or any sub-condominium unit owners. It did not "add real estate" to the GIS condominium because the improvement was constructed entirely within the existing real estate of IDC's north development unit. Similarly, construction of the Regatta Club did not create additional units, did not subdivide units, and it did not add or withdraw real estate from the GIS condominium. Rather, the number of units, the amount of land, and the area comprising the master and limited common elements within the GIS condominium remained the same after the construction of the Regatta Club as before. In any event, even if such an improvement could be construed to "add real estate" to the GIS condominium, in doing so IDC was not acting as a declarant but as the owner of the unit and thereby was entitled to improve its property as allowed by law and by the declaration.

Moreover, the rights of IDC to improve its master units were no different from the rights other condominium unit owners enjoy with respect to their units. Thus, for example, the owners of the units in the Harbor Houses condominiums have continually expanded, upgraded, and altered a majority of the buildings within their master condominium unit. They did so not by exercising any reserved development rights, but simply by acting in their capacity as owners of units that can be improved as the owners may desire, subject to the declaration and to other applicable land-use laws. Indeed, this is the very reason why Globe Manufacturing, in its capacity as the original declarant, structured the GIS condominium to require the owners of the unimproved condominium units to pay substantial taxes and condominium fees in perpetuity—way beyond the term of any development rights—because the owners of these units were entitled to improve them as they saw fit, subject to applicable land-use law. Such a provision begs the question of why would any unit owner pay substantial condominium fees, based on land area, merely to hold title to unbuildable vacant land?

Furthermore, it is hardly inconsistent with the act for a declarant such as Globe to have reserved development rights with respect to the individual condominium units that it owned and then sold to IDC. Thus, § 34–36.1–1.03(11)(C) clearly indicates that a condominium unit in itself can be subject to development rights because such rights include the right to "[s]ubdivide units or convert units into common elements." Indeed, the development right for a declarant/owner to subdivide units or convert them into common elements can only be applied to a declarant who also owns existing condominium units. (It would be impossible to subdivide or convert a unit into a common element if the unit did not already exist). In any event, no provision in the act barred a declarant such as Globe and its successor, IDC, from reserving development rights with respect to an existing or newly created condominium unit.

For these reasons, I would hold that IDC possessed the right to alter and improve the master units it owned, including

the right to construct and operate the Regatta Club on the north master condominium unit, regardless of whether its development rights as a declarant expired in 1994.

But the majority decrees that "when the associated development rights expired, so also did all of the declarant's rights in the master units." This is simply not so, however, because, even if the development rights expired, IDC still owned the units in fee simple.[26] Yet the fact of IDC's ownership gives the majority no pause. Accordingly, having declared that IDC has no development rights with respect to the units it owns, it then decrees that, "the hearing justice should have declared that title to the disputed property vested in the individual unit owners in fee simple."

What could be the possible justification for this divestiture of defendants' property, taking from them the condominium units they own at the GIS condominium and transferring them to non-parties; to wit: the individual sub-condominium unit owners in the America, Capella, and Harbor Houses condominiums? Does all this follow, as night follows day, merely because IDC's development rights expired in 1994? The majority suggests that "defendants assert that the condominium is composed of separate lots." But defendants make no such assertion. Rather, they assert only that which is true: namely, that, after the 1994 amendments, the GIS condominium was comprised of six separate condominiums units, of which they indisputably owned three of them. Thus, even though, for title purposes, the GIS condominium may only contain "one legal lot," as the majority suggests, in reality and under law the property comprising the GIS condominiums was divided into separate condominium units, and these separate units have been the legal and factual reality on this Goat Island property since Globe Manufacturing first created the GIS condominium.

The majority then simply asserts that although "[t]he master declaration granted the declarant a limited period to develop certain parcels of land within the condominium, * * * it could not convey title to the air space if the development rights were not exercised." Why not? Since a declarant can also be an owner of the unit, and since units can consist of air spaces,[27] why cannot a declarant also own such units within the condominium, with or without associated development rights? And why cannot the master declaration convey title to such units to the declarant, regardless of whether development rights ever existed and irrespective of whether they were or were not exercised? Even plaintiffs did not challenge the Sixth Amendment to the GIS declaration, pursuant to which IDC became the owner of the north development unit.

**26.** The majority says that it is "puzzled" by this statement, indicating that "at no time have defendants ever asserted that they own the land underlying the master units in fee simple." Although this statement is correct, what the majority apparently does not understand is that the units themselves, apart from the land, constitute "real estate" under the act. The defendants own this real estate in "fee simple"—even though they do not assert, nor have they ever asserted, that they own the land underlying their GIS master units in fee simple. Rather, the land underlying these units is owned by the GIS condominium, but as a limited common element, it is reserved for IDC's exclusive use. In short, the land underlying the units and the units above the land are discrete portions of the real estate at these Goat Island condominiums. As such, they can be and have been separately owned "in fee simple" by different entities.

**27.** *See McConnell v. Wilson*, 543 A.2d 249, 250 (R.I.1988) (recognizing existence of air space units).

Although it acknowledges that the un-challenged Sixth Amendment to the GIS condominium declaration converted the land under the reserved area or north unit into a limited common element and vested ownership of the unit itself in IDC, the majority, paradoxically, concludes that "the entire parcel * * * was common area from the time the master [declaration] was recorded." *See DiBiase v. Jacobowitz*, 43 Mass.App.Ct. 361, 682 N.E.2d 1382, 1385 (1997). But *DiBiase* is totally inapplicable to this situation because, here, the development rights were not attached to a master common area, as was the case in *DiBiase*, 682 N.E.2d at 1384, but to separate, privately owned condominium units; to wit: the south, west, and north development units. Thus, even if IDC's development rights expired, its ownership of these condominium units continued without interruption or abatement—at least until the majority's decision in this case. In *DiBiase*, 682 N.E.2d at 1383, when the development rights expired, all that remained was a common element. Here, however, what remains are undeveloped privately owned units that are still owned by IDC on top of land that was exclusively reserved for IDC's use. Unlike *DiBiase*, these areas constitute privately owned condominium units and *not* common areas. Indeed, even the land beneath these units is a limited common area reserved exclusively for IDC's use. Thus, contrary to the majority's conclusion, even if IDC's development rights with respect to those units had expired, its ownership rights in the master units, including its right to improve and alter them under § 34–36.1–2.11, never expired. Thus, the Court has no basis in law or equity to transfer these units to other individual unit owners without awarding any just compensation to IDC for such a massive taking of its private property.

In sum, there is no justification whatsoever for the majority to confiscate the real estate constituting these units from IDC and then to order that its ownership and title to these units must be transferred to the individual owners of sub-condominium units in the America, Capella, and Harbor Houses condominiums. Given the multi-million-dollar value of the Newport Regatta Club alone, this unprecedented judicially mandated forfeiture, condemnation, and transfer of property to people who are not entitled to it, and without payment of any just compensation to IDC, the rightful owner, was not an appropriate remedy in this case.

## Conclusion

The interests of consumers of condominium units and other goods and property are not protected or advanced when the law in a given jurisdiction is construed in such a way that developers stand to lose all their invested capital if, many years after the fact, some court misinterprets the law and declares that they failed to comply with a technical legal requirement before they began to build on the property.

And consumers are not protected by interpreting a jurisdiction's laws in such a way that producers and developers of consumer goods, services, and property are punished for their good-faith attempts to comply with applicable law when they attempt to deliver such products to consumers. The worst way to protect consumers is to deprive them of opportunities to consume products that otherwise would be available to them, but for a misguided and investment-killing interpretation of a jurisdiction's applicable laws.

With respect to real estate development projects involving condominiums, developers and consumers alike are now cast adrift on a dark and stormy ocean of doubt and uncertainty. After this decision, what real-estate developer in its right mind

would proceed to build a condominium project, create a master association, and offer units for sale to consumers when, ten years later, a court can take its property away with one stroke of its pen merely because the developer allegedly failed to comply with voting procedures that a court later rules were required?

For these reasons, I would reverse, vacate the summary judgment entered in favor of the plaintiffs, and remand this case to the Superior Court with instructions for it to enter judgment in favor of the defendants dismissing the plaintiffs' claims with prejudice.